IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 14, 2004

## STATE OF TENNESSEE v. SHERIDAN ARMSTRONG

**Appeal from the Criminal Court for Shelby County**
**No. 01-12797      James C. Beasley, Jr., Judge**

---

**No. W2003-02100-CCA-R3-CD  - Filed October 20, 2004**

---

The defendant, Sheridan Armstrong, was convicted of felony murder and aggravated child abuse. The trial court ordered concurrent sentences of life with the possibility of parole and twenty years, respectively.  In this appeal of right, the defendant contends that the trial court erred by failing to suppress his statement to police and argues that the evidence supporting each conviction was insufficient.  The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Garland Erguden (on appeal), Phyllis Aluko (at trial), and Karen Massey (at trial), Assistant Public Defenders, for the appellant, Sheridan Armstrong.

Paul G. Summers. Attorney General & Reporter; Michelle Chapman McIntire, Assistant Attorney General; and Linda Kirklen and James Wax, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

        In January of 2001, Tameka Stuckey, the mother of the twenty-two-month-old male victim, Jaylon Stuckey, resided with her two children and the defendant in an apartment in Memphis.  After an argument, the defendant provided her with the money necessary to purchase medication for the victim, who had a cold.  When Ms. Stuckey returned an hour or two after her departure, her mother was present and informed her that the victim had been taken to the hospital.  The defendant had telephoned 911 and accompanied the victim to the hospital in the ambulance.  Three hours later, Ms. Stuckey learned from hospital personnel that the victim's heart had stopped.

Lieutenant Reginald Morgan of the Memphis Police Department interviewed the defendant. After initially denying that he had harmed the victim, the defendant later confessed in a typewritten statement that provided, in part, as follows:

> I got home, me and [Ms. Stuckey] was arguing and she was talkin[g] about moving to Mississippi to work at Walmart and I told [her] I was gonna get my clothes and move back home with my mom. I tried to talk to her about our problems because I didn't want her to go.
>
> We worked it out and she asked me for some money to go to get [the victim] some medicine. [Ms. Stuckey] left and me and [the victim] was left at the house. I was cleaning up the house after she left and [the victim] got up out the bed and he was crying and he was getting to me and I asked him to be quiet. I told [the victim] I loved him and after that I kicked him once in his chest and he fell on the floor. He got up on his own and he was crying. I kicked him again and he fell on the dresser and bumped the back of his head and he fell to the floor. I picked him up and put him on the couch and called his grandma and told her he wasn't responding to me. . . .

The Shelby County Medical Examiner, Dr. O'Brian Clary Smith, who performed the autopsy, found "blunt trauma to the head, blunt trauma to the chest that produced injury to the internal organs o[f] the chest, blunt trauma to the abdomen that produced internal injuries to the abdomen, with . . . extensive tearing of the liver, [and] associated bleeding that put the child into shock" resulting in death. Dr. Smith found that the injuries were comparable to those expected in a fall from twenty-two feet or an automobile accident at twenty-five miles per hour. It was his opinion that the nature of the injuries was consistent with the victim's having been kicked twice by an adult and having struck his head on a piece of furniture. Dr. Smith concluded that the victim would have shown symptoms of his injuries immediately and would have been in shock within a matter of minutes, dying no more than two hours later. It was his belief that the death was a homicide.

At trial, Frank Cole, the victim's biological father, testified on behalf of the defense, implying that Ms. Stuckey may have been responsible for the injuries. He stated that he observed a burn on the victim's leg in May of 2000 and took him to the doctor in spite of Ms. Stuckey's wishes to the contrary. Cole acknowledged during cross-examination that he had never seen Ms. Stuckey "raise[] a hand to either one of her children."

The defendant, testifying on his own behalf, professed his love for the victim and denied that he had kicked him. He stated that he met Tameka Stuckey at Wal-Mart, their place of employment, and moved in with her some months later. The defendant testified that on the morning of the victim's death, he interviewed for a second job at McDonald's and then stopped at his mother's residence before returning to the apartment he shared with Ms. Stuckey and her family. He recalled that he and Ms. Stuckey watched a movie before he returned to his mother's residence. He claimed that later, Ms. Stuckey telephoned, asking that he return her car. According to the defendant, his

younger brother, who had spent the night, and Ms. Stuckey's older child had left the apartment with Ms. Stuckey's aunt by the time of his return. He maintained that because the victim had been sick for a week, he gave Ms. Stuckey money to purchase medicine. The defendant contended that after she left, he was cleaning the house when he noticed something wrong with the victim. He claimed that after calling both his mother and Ms. Stuckey's mother, he telephoned 911 twice and accompanied the victim to the hospital. The defendant testified that while the victim was being treated at the hospital, he asked to borrow Ms. Stuckey's car to pick up his mother. According to the defendant, he stopped at his residence to drop off some groceries Ms. Stuckey had left in the car, phoned his mother, and then learned that the victim had died. The defendant acknowledged that each detail he had provided in his five-page statement to the police was truthful with the exception that he had not kicked the victim. He explained that he confessed to kicking the victim only because he felt threatened by the officers, one of whom had a gun on the table, and because they had promised he would be released.

I

Initially, the defendant contends that the trial court erred by failing to suppress his pre-trial statement to police. The state disagrees.

At the hearing on the motion to suppress, Lieutenant Robert Shemwell, who assisted Lieutenant Morgan with the interview of the defendant, conducted eight days after the victim's death, confirmed that Lieutenant Morgan advised the defendant of his Miranda rights. According to Lieutenant Shemwell, while the defendant informed the officers that he had a tenth grade education and could not read well, he was able to read the advice of rights form aloud before affixing his signature. It was his recollection that the defendant was not under the influence of alcohol or drugs, was not acting in an unusual manner, understood the questions, and conversed coherently. Lieutenant Shemwell testified that the defendant initially denied involvement in the victim's death, but confessed to having kicked the victim when confronted with the medical examiner's findings. He recalled that the defendant agreed to give a written statement and that Anne Langford, a transcriptionist with the department, typed the questions and the responses. He testified that after the interrogation, another department employee read the statement to the defendant, who then signed it. According to Lieutenant Shemwell, the statement was begun at 4:30 p.m. on January 11, 2001, and ended at 6:10 p.m. He acknowledged that the defendant's arm was handcuffed to his chair during questioning, but denied that either he or Lieutenant Morgan had ever threatened the defendant, behaved in a physically aggressive manner with the defendant, or promised the defendant that he would be released if he gave a statement. The lieutenant, who stated that he was unarmed during the interrogation, testified that the defendant neither requested an attorney nor gave any indication that he was in physical discomfort. He testified that the statement was not tape recorded because it was department policy to take a written statement when a transcriptionist was available.

Lieutenant Morgan generally confirmed the testimony of Lieutenant Shemwell. He recalled that after he advised the defendant of his Miranda rights, the defendant read the first three lines of the advice of rights form aloud and the remainder to himself. The officer testified that the defendant

was coherent, understood his rights, and was free from the influence of any drugs or alcohol. He recalled that during the course of the interview, they provided the defendant with a soft drink, potato chips, and bathroom breaks. Lieutenant Morgan stated that the defendant was calm during the first two to three hours, but showed nervousness when they began discussing his involvement in the victim's injuries. He denied being armed during the interrogation and further denied threatening to "fry [the defendant] for this." According to Lieutenant Morgan, the defendant "started crying at the emotion he felt for the child . . . . And he made the statement to us that if they do charge me, I hope they . . . charge me with murder one because of what I have done."

Dr. Fred Steinberg, a clinical and forensic psychologist, testified on behalf of the defendant. He stated that after performing a forensic psychological evaluation of the defendant, it was his opinion that the defendant suffered from mild mental retardation. The doctor determined that the defendant had a verbal IQ of 64 and a full-scale IQ of 61, accompanied by a consistent level of reading comprehension difficulty. He related that the defendant read on a third-grade level and that the advice of rights form provided for his signature was written on a fifth-grade level. Dr. Steinberg testified that it was his opinion that the defendant "was not able to read and understand his advi[c]e of rights." It was also his opinion that the defendant was in the third percentile of the population in listening comprehension. Upon questioning, he conceded that it was "hard to say" what impact the defendant's prior experience with the criminal justice system had on his comprehension of his Miranda rights.

The defendant testified that he did not recall being advised of his Miranda rights at any time or having anyone read his five-page statement to him. He stated that the officers who interrogated him were "rude" and spoke to him like they were "upset." The defendant contended that one officer, whom he could not identify, threatened to "shoot [his] ass" and that they promised him he could go home if he cooperated. He insisted that had he understood his rights, he would have refused to speak to police and would have requested an attorney. Although the defendant could not recall signing anything, he acknowledged that his signature appeared on the typewritten statement. Angela Armstrong, the defendant's mother, was also a witness at the suppression hearing. She testified that the twenty-three-year-old defendant could not read and has a short attention span.

Dr. Lynn Zager, a Ph.D. psychologist and the forensic services director of Mid-Town Mental Health Center, provided rebuttal testimony on behalf of the state. While Dr. Zager acknowledged that the defendant was mildly retarded, she did not believe that he was as "low functioning" as his school records indicated. Dr. Zager testified that after she told the defendant that her examination was not confidential, the defendant correctly interpreted her comment to mean, "Whatever I show you, you show the [j]udge, the prosecutor and the lawyer."

At the conclusion of the suppression hearing, the trial court found that the defendant understood his Miranda rights and that his confession to police was knowing and voluntary:

> I am . . . going to consider the fact based on the proof from the juvenile court file that [the defendant] has been through the juvenile system. He was represented

by an attorney at that time. And so he has some familiarity not only with . . . the legal system, but he has some familiarity with the fact that he . . . is entitled to a lawyer.

I also note that both doctors, Dr. Zager and Dr. Steinberg, agreed that [the defendant] showed some signs of malingering . . . .

I did note . . . that [the defendant is] able to drive an automobile. . . . I did note that he was able to cite and give his social security number, his phone number, his address. He was able to give [that] information clearly and concisely.

\* \* \*

[I]t's obvious to the court that [the defendant] has the ability to recall details, specifically spell those details out, repeat those details to law enforcement officers. So that in my opinion he has the ability to hear, exist, live, and comprehend what's going on around him and to feed that information back. So it's obvious to the court that [the defendant], although having a lower than normal IQ, is able to function and carry on a daily lifestyle within our society.

\* \* \*

The court must note from the advice of rights form that . . . there is nothing about this . . . form that is complicated or that is complex.

\* \* \*

I must add . . . [that] in this court's opinion, it was obvious that [the defendant] was being evasive in some of his answers.

\* \* \*

The court finds that [the defendant] is able to . . . rationally conclude what answers he wants to give and what answers he doesn't want to give. . . . The court is of the opinion that [the defendant] understood the rights that were read to him by the officers in this case. That [the defendant] acknowledged and understood . . . those rights and that he acknowledged and stated willingly and freely and voluntarily that he was willing to give those rights up and to give a statement to the officers.

It is the duty of the trial judge to determine the voluntariness and the admissibility of a defendant's pretrial statement. State v. Pursley, 550 S.W.2d 949, 952 (Tenn. 1977). The trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge." Id. Testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). If the "greater weight" of the evidence supports the court's ruling, it will be upheld. Id. Yet, this court must conduct a de novo review of the trial court's application of law to fact. State v. Bridges, 963 S.W.2d 487 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997).

In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court ruled that before a custodial interrogation, police officers must advise a defendant of the right to remain silent

and the right to counsel. If these warnings are not given, any statement elicited from a defendant is not admissible in trial. Dickerson v. United States, 530 U.S. 428 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 479; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order for an accused to effect a waiver, he must be adequately appraised of his right to remain silent and the consequence of deciding to abandon it. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). In determining whether a confession was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

In our view, the record supports the trial court's determination that the confession was knowingly and voluntarily made. Although the mental health experts concluded that the defendant was mildly mentally retarded, each characterized him as "high functioning." The defendant was able to drive, hold down a job, and otherwise function in society on a day-to-day basis. The officers who interrogated the defendant testified that he was coherent and appeared to understand his rights. The defendant had, in fact, had previous experience with the police and the court system as a juvenile. Under these circumstances, the trial court did not err by admitting the confession. The evidence does not preponderate against the trial court's determination that the statement was knowing and voluntary.

II

Next, the defendant contends that the evidence presented at trial was insufficient to support either of his two convictions. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Child abuse occurs when "[a]ny person . . . knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a). Child abuse becomes aggravated when it either results in serious bodily injury to the child or a deadly weapon is used to accomplish the act. Tenn. Code Ann. § 39-15-402(a). First

degree murder is the "killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse." Tenn. Code Ann. § 39-13-202(a)(2).

The defendant's argument is based primarily upon his contention that his confession to police should have been excluded. As we have already stated, however, the confession was properly admitted and considered by the jury. The autopsy revealed that the victim died of multiple internal injuries caused by blunt trauma to the head and chest. It was the medical examiner's opinion that the injuries would have manifested themselves immediately and resulted in the victim's death in no more than two hours. The victim's mother, Tameka Stuckey, testified that the victim was uninjured when she left the residence to purchase medicine for him and run other errands. While she was gone, he was in the sole care of the defendant. The defendant admitted to police that, stressed by the state of his relationship with Ms. Stuckey, he kicked the victim twice in the chest, causing him to strike his head on a piece of furniture. The evidence was sufficient to establish the defendant's guilt beyond a reasonable doubt of both aggravated child abuse and felony murder. Dual convictions under these circumstances do not violate double jeopardy principles. State v. Godsey, 60 S.W.3d 759 (Tenn. 2001).

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE